# IN THE U.S. COURT FOR THE SOUTHERN DISTRICT OF IOWA

Christopher W. (Bruce), the Living Man,
Elizabeth (Bruce), the Living Woman
    Plaintiffs (Claimants) Sui Juris
    Minnehaha County, SD

v.

Polk County Attorney's Office, Des Moines, IA
    John P. Sarcone, Polk County Attorney
    Jesse Ramirez. Pk. Cty. Atty.
    Stephanie Brown. Pk. Cty. Atty.
    Kevin J. Brownell. Pk. Cty. Atty.
    Kevin Bell, Asst. Pk. Cty. Atty.
The Iowa Dept. of Human Services, Des Moines, IA
    Katie Gosch, Caseworker
    Stephanie Rhinehart, Supervisor
    Emily Nieman, SW4
The Des Moines Police Department, Des Moines, IA
    Jake Lancaster, Detective
The Altoona Police Department, Altoona, IA
The City of Carroll Police Department,
    Carroll, Iowa
    Greg Bellinghausen, Officer
The Iowa State Attorney General's Office,
Des Moines, IA
    Grant Dugdale, Asst. Atty. Gen.
    Katherine Miller-Todd, Asst. Atty. Gen,
Children and Families of Iowa (FSRP)
Des Moines, IA
    Ashley Andrews, Visit Supervisor
Judge William A. Price, District 5C,
    Polk County, IA
Judge William Kelly, District 5C,
    Polk County, IA
Judge Robert Blink, District 5C,
    Polk County, IA
Judge Carol S. Egly, District 5C,
    Polk County, IA
Judge Jeanie Vaudt, District 5C,
    Polk County, IA
Magistrate Anastasia Hurn, District 5C,
    Polk County, IA
Linda Lane, Assistant U.S. Attorney, D.O.J.
    (Former Asst. Polk County Attorney)
    St. Louis, Missouri
Dale Mays, Attorney
    Benzoni Law Firm, Des Moines, IA
Paul White, GAL Attorney
    State of Iowa GAL, Des Moines, IA
Beth Walker, Attorney
    Walker Law Firm, Newton, IA
Anthony Reed, Manager
    Central Iowa Family Services
                Defendants

Case # _____

CLAIM AND REQUEST FOR MATTER
TO BE HEARD BY A JURY



Comes now, Christopher (Bruce), The Living Man, come before this court, and place, in it, this federal Claim and sworn affidavit against these defendants, and I hereby designate it as truth, using my best recollection of the events as they occurred. Two initial points of importance to note:

1.  That jurisdiction shall be defined, proven and granted to the court by the claimant, as is my right.

2.  Some defendants listed in this Claim will certainly claim immunity to prosecution, as well as sovereign immunities. It will be the burden of the claimant to show the court how these will not apply in this Claim.

## JURISDICTION

The court shall have jurisdiction, in that this Claim is a federal question case, being brought under and through Federal Codes 42 U.S.C. §1983; (Deprivation of our rights using color of law), under 18 U.S.C. §1961 (The RICO Act. Concerning this matter, RICO will define a criminal organization operating under the guise of leadership on the state, county and city levels) and under 18 U.S.C. §241, (Conspiracy against our unalienable and civil rights;) and will also address the violations of our 5th Amendment right (due process of law,) our 1st Amendment right (free speech), Christopher's 6th Amendment right (the right to represent myself); and Christopher's 8th Amendment right (against unreasonably or excessive high bonds/bails/fees without good cause.), all guaranteed by the United States Constitution first party witnesses and sui juris litigants.

## VENUE

Since all events in this Claim happened in the city of Des Moines, Iowa and in the county of Polk; and since the majority, nearly all of the defendants reside in the same; venue is in the Southern District of Iowa.

## THE PLAINTIFF

The Plaintiffs, hereinafter known as "claimant", "claimants" or plaintiffs, are naturalized sovereign nationals of the State of South Dakota. during the course of these events, the

claimants also resided in the same county and state until March of 2015. Crimes later against the claimants were brought by Polk County, and the alleged charges would all be stated to originate in Polk County.

## THE CLAIM

1.  On July 21st, 2014, The Iowa Department of Human Services did unlawfully remove my legal daughter, T.B. from Christopher (hereinafter identified as C.B.); without his consent or knowledge, and from the biological mother's care (hereinafter identified as E.B,), our daughter, T.B. (E.B.'s biological property), based solely on unproven and unlawful allegations; at only 9 days of age. This followed a mandatory stay for our daughter at Methodist Hospital in Des Moines, Iowa, of 72 hours (E.B. was not told this initially. She didn't find out all that she would have to stay until around the halfway point of the stay). Six to seven felonies did occur during the course of this removal, including kid-napping, depravation of E.B.'s rights using color of law, denial of the intervention of ICWA for nearly six months by and through falsification of legal and Government documents, falsifying legal and government documents, forgery of a judge's signature to a legal document, and finally, her later perjury, slander and libel of us, as she testified on the stand, and wrote in her reports; concerning not only the removal of T.B., but also in her legally required twenty one day assessment of our family, which caused us to be temporarily and wrongfully placed on the abuse registry.

2.  A recording was made of the entire eighteen minutes of the temporary removal. Emily Nieman, SW4, of the Department of Human Services and E.B. were clearly present. During this recording, Ms. Nieman is heard asking the mother if she had any Indian Heritage in her family. E.B. would say yes, and Ms. Nieman would then check "No" on the removal form. She then filed her affidavit to the court that the mother had no Indian heritage in her family on July 21st, 2014. E.B. is 1/8th Cherokee, T.B. was the minimum required, just on her mother's side, at 1/16th. The parents had to motion the court for intervention, when they didn't even know that intervention was possible (at the time of the removal), let alone for 5 months after that date; after they had found out that Ms. Nieman had done this. This court shouldn't have even been involved to begin with; and wouldn't have been either, if it

had not been for the actions of Ms. Nieman.  This of course means that everything that happened after this box was checked "No" is VOID.  The district court of 5C in Polk County, Iowa, from that point forward, NEVER had ANY VIABLE, JURISDICTION of ANY kind to hear ANY matter concerning T.B. and E.B., until their heritage was properly determined.  They most CERTAINLY had no jurisdiction to hear any matter concerning claimant C.B., and said so too; but only after six months of his being their target in the case; after they felt that they had sufficiently made an example out of us both, and when C.B. was about beat the case.  It was then that C.B. would be deemed an extraneous EXTRA father, an unnecessary party to the case.  Ms. Nieman, by checking "No" on E.B.'s form when E.B. stated "yes" constitutes falsifying court and government documents and information.  That act alone also constitutes FRAUD, and vitiates any and all orders issued by Judge Price concerning the matter.  All decisions made by his court were, therefore, VOID.  On this matter ALONE, E.B.'s rights should be immediately restored; T.B. was in her possession at the beginning, and E.B. was removed from her illegally, and still is her biological property.  On the recording, Ms. Nieman states that she is going to read the entire order to E.B., then have her initial the check boxes to show that Ms. Nieman had read it all to her, and that E.B. understood everything on it, then said she needed E.B. to sign it.  She read her three lines of the order, lines one, two and four, and did not read to her anything that concerned the reasons for removal, anything that told the mother her rights concerning the removal, only those lines that explained that she was taking T.B., a petition would be filed, and that her rights might be terminated.  Ms. Nieman would then put check marks in all of the boxes for E.B. (effectively, forging the mother's initials in the boxes with a mark, showing the mother heard and understood what she was about to sign when she most certainly did not), and puts her under duress, saying that if she doesn't sign it, a judge will look unfavorably on it, then states it doesn't matter if she signs it or not, the child will be removed to foster care, regardless.  Per Iowa Statute, steps (defined as "reasonable efforts") must be taken in order to prevent or eliminate the removal of an Iowa child, and they MUST be listed on the temporary removal form.  The box was checked, and three empty lines followed it.  NO steps were taken, and none were listed.  At the bottom of the form, the judge's name, William A. Price, was forged by Ms. Nieman.  Even if it had been Judge Price's actual signature, it is signed fraudulently by his order on the form;

since, if nothing else, in the order, it states that he finds that reasonable efforts to prevent or eliminate the removal of T.B. have been taken; but none are listed; and, since they are required to be listed by statute, Judge Price broke the law by signing it.  More so, Mrs. Nieman, on this recording, uses legal duress to have the mother sign her child into foster care, and uses color of law, by stating that the removal is court ordered ALREADY, and that if she doesn't sign it, it doesn't matter, the child will be removed to foster care, regardless.  She was trying to coerce her to sign the consent for removal, and it isn't "court ordered" until the court ORDERS IT, and it can't be court ordered, unless she signs this form.

3.      On July 22nd, 2014, at our first Family Team Meeting (called this while in attendance, but later claimed to be a "Post Removal Hearing", and was then claimed to be a separate and ADDITIONAL "reasonable effort" made to us in order to help our family reunify), attorneys were assigned both the mother and I (Mr. Dale Mays for the mother - Colin McCormick for the father), and Attorney Paul White was assigned to T.B, as GAL.  Katie Gosch was assigned as our DHS caseworker for the duration of our proceedings, and Ashley Andrews of Children and Families of Iowa (hereafter called "CFI") would be our visit supervisor.  The father, at this hearing, asked Attorney Mays why it was necessary that we have one attorney per parent. He stated that this was done in Iowa because it was possible that the parents would have divergent interests concerning the child's welfare, down the road.  I stated that we had no such divergent interests NOW, and we didn't need two attorneys.  He stated that we had no choice in the matter.  The claimant states that this is done because all of these conspirators KNEW there would be "divergent interests" along the way; and if there weren't any, they would assure that there would be some, and that they would be the cause of it, by and through their actions against us.  The claimant brings that the hiring of two attorneys, one per parent, should be a decision to be made by them; at a time that their interests actually did become "divergent," if at all.  Because of the statement made by attorney Mays, and the illegal and unlawful removal of T.B., the parents decided to fight against everything DHS and the courts would ask us to do.

4.      The removal hearing took place on July 29th, 2014.  The judge ordered our child to be a CINA and approved the removal as valid.  At this hearing, a week after the

temporary removal was ordered, Judge Price would state that the forced 72 hour stay of E.B. at Methodist Hospital was the ONLY reasonable effort made E.B., in order to prevent or eliminate the removal of T.B.

5.      Drug testing of both the mother and the claimant was ordered by the court at the removal hearing on July 29th, 2014. As we already suspected that the court, DHS, the county attorney's office AND our own lawyers were working in concert against us, and because the removal hearing had been a complete legal travesty, we decided to experiment to see if this were true. We noted immediately that not only was C.B.'s online blog being used against us in court, almost word for word; we also noted that they followed it almost religiously. Things the claimant wrote were, first, used as reasons they used to take our child; and later, they would continue to use it to keep the case afloat against us. C.B. then decided to start testing that theory, and decided to store up the results of that experiment to use against them in later actions. The claimants began doing this with the drug test. In the blog, C.B. wrote that he might come up dirty for two drugs, meth and pot, and posted this right after we took our drug tests, and prior to the results. Once Judge Price ordered our test, the mother and C.B. immediately complied and tested at Central Iowa Family Services, a DHS contracted drug testing facility. Both results came back as positive for meth and amphetamines, the worst of the two drugs C.B. had mentioned in his post. The DHS quoted exact phrases he used in the article, those lines that stated that he might be dirty for these drugs. Neither of the claimants do any drugs. The cordstadt test of E.B. and T.B, done at Methodist Hospital two weeks prior to this testing had been negative for any drugs. Before taking that drug test, the employee did not ask E.B. if she was using any medications, like other drug testing facilities do.

6.      C.B. then wrote an article concerning our 1st test, and posted it on August 4th, 2014. Prior to the test, C.B. dyed and cut his hair, something he did and still does frequently. In the article, he described the manner in which the testing was done, and described in full detail the location that the testing was done in. It had dirty shag carpeting and had no furniture in it anywhere, save a large hotel type desk. There was one employee present, and sitting at a large desk in a big open room with no other furniture or walls in it. As he entered and told him why he was there, the male employee stated "Man! I'm going to have to butcher your hair to get

a good sample!" He then proceeded to procure that sample by cutting his hair off with an un-sanitized pair of school scissors. At no time was he wearing gloves. He then sealed the hair into a small envelope to mail to a lab somewhere, and said he could go. Worker Gosch claimed I cut and dyed my hair on purpose, to fail the test.

7.      The CINA petition was filed on July 22nd, 2014, and was drawn up and filed by Stephanie Brown, Asst. Polk County Attorney and Advocate for DHS. Per Iowa Code, the petition is to be immediately served to the parents, and a document is to be signed, agreeing that it was served. Filed on July 30th were two documents that we had allegedly signed, agreeing that we had received service of this petition. We had not, nor did we remember seeing this petition or signing the papers stating that we had been served this petition. We testified this fact to the court. Neither parent received this petition until the Adjudication hearing on September 12th, 2014, when Judge Price ordered a copy be given to C.B., since he had decided to represent himself, and asked to receive a copy. The claimants claims that these legal documents, showing that this petition was served to both of us, were forged or scanned onto with our signature.

8.      Drug testing results, per Iowa Statute, are not allowed as evidence in an adjudication hearing. The results of the drug testing done prior to our adjudication was used as evidence against us in our adjudication hearing, held September 12th, 2014.

9.      Since the claimants lost their home, because of DHS's actions against us (and their unwillingness to assist us with FIP and food, though we had applied for it a few weeks prior to the removal) E.B. was forced to stay in a homeless shelter, and C.B. chose to stay with friends. We had been without money for weeks; because E.B. had been forced to take a 6 week mandatory leave from work; due to the birth of T.B. She would finally return to work on or around September 1st, 2014.

10.     On September 5th, 2014, another Family team meeting (our 2nd) was held. Immediately following this meeting, Dale Mays would insist that E.B. fill out another financial affidavit, showing that she was now working (at $7.90 an hour for 20-24 hours a week), and that she had no expenses (because she lived at a homeless

shelter).  This affidavit followed a financial affidavit that was already in place from the month prior, showing the mother had no income, which allowed E.B. to be assigned Dale Mays at State expense.  At no other time during the course of this case had another financial affidavit been required of us to fill out, or asked for.  C.B. finally had E.B. fill another one out on January 8th, and filed it in our case.  We had testified to the court our situation several times.  All at DHS, Mr. Mays, Judge Price, and the prosecution; were aware of our status and situation.

11.   The adjudication hearing was held on September 12th, 2014.  Prior to the hearing, C.B. had placed over 1000 flyers, advertising the hearing, all over the downtown Des Moines area.  On the date of the hearing, the room the hearing was held in was changed three times within a half an hour of the hearing; and when some people finally found it, and asked to be let in, the Sheriffs would ask Judge Price to permit their admittance, and he would deny it.

12.   C.B.'s attorney, Colin McCormick, was asked to withdraw from his service on September 5th, 2014.  On September 12th, 2014, Judge Price allowed him to withdraw, during the hearing for adjudication; and C.B. represented himself, pro se, for the remainder of the proceedings to follow.  After this hearing, Stephanie Brown stepped down as the Asst. County Attorney in charge of our proceedings, and Asst. Polk County Attorney Kevin Brownell appeared in the case in her stead.

13.   In an order issued September 12th, 2014, Judge Price would order a drug assessment and treatment for the claimants.  We refused, stating that we did no drugs.  Judge Price would also order that we both have a mental evaluation and treatment.  We refused.  I did not have mental issues, and the mother had already been evaluated, and results showed that she only had a learning disability.  E.B.'s evaluation was not acceptable for their files, DHS stated, because it wasn't done by a DHS approved evaluator, but it would be used to back up their claims that she was unfit to parent, filed it and used it against her as evidence, in order to claim that fact.  The evaluation had been done by Iowa Vocational Rehabilitation, using a more than qualified specialist in the field.

14.   After the adjudication, C.B. posted an article about what had happened with it.

on my online blog, scanned in all the relevant documents, and put it all up on that same day. 2 days after this article was posted, I was locked out and denied access to any document filed by the prosecution in our case, due to my being "a security risk", according to the Electronic filing system. This block was on my account until well after the disposition hearing. I then finally asked to speak to Randy Osborn, the head Polk County Clerk. He acted as if he had no idea what had happened, and said he had no idea why I wasn't allowed to look at the prosecution's filed documents. He then called Judge Price to ask if I could be allowed access. Judge Price said yes, and the next day, Price would file an order, to allow me full access to the case, as if I didn't have this already, as my own attorney. This would indicate that he and the Clerk of Court had, purposely, denied me access (as well as my due process) to my court documents for almost 2 months.

15.   On September 12th, 2014 following our adjudication hearing, C.B. contacted Ashley Andrews of CFI by text and demanded that she remove herself as our visit supervisor, and get us a replacement. We did this because Mrs. Andrews had taken the stand in our adjudication hearing and testified and lied against us. Not a single good thing was said about us. Ms. Andrews went to her supervisor, Jamie, to report my texts. Ms. Andrews also contacted Katie Gosch and her supervisor, Stephanie Rhinehart about this. Just a couple of days later, we had a visit with T.B. Before it proceeded, all four of these women wanted to talk with only C.B., in order to discuss the events following our hearing, and to discuss the messages he had sent to Ms. Andrews. They would then state that Ms. Andrews would continue to be our visit supervisor, and told C.B. that he was to no longer contact her for any reason by text or phone, but that he would text her supervisor, Jamie to verify his attendance at his visits. They also stipulated that he not speak to Ms. Andrews in his visits. C.B. agreed to the terms. I had recorded the entire meeting and that day's visit.

16.   On September 24th, 2014, DHS Supervisor Stephanie Rhinehart called C.B.'s phone and left him a message. In it, she stated that she didn't care for what he was writing about in his blog (about all that the Department and the courts were doing to us), and that, unless he stopped, and would agree to meet with her supervisor, that he would no longer be allowed to visit his daughter. C.B. then returned her call, and in a voice mail left for her, told her that there was no way he would agree

to her terms, and, essentially, told her that she could go to Hell.

17. On September 30th, 2014, he then received a call from a detective Greg Morse of the Des Moines Police Department.  He told C.B. that Stephanie Rhinehart, the DHS supervisor, together with Ashley Andrews of CFI and her supervisor, Jamie, were attempting to file harassment charges against me.  As he went over the facts,

C.B.

stopped him when he mentioned a message he left her, telling her to go to hell, and told him that message had been left in response to her call to him, and that he had a voice message recording from her that stated "Call me", and that he had recorded the entire meeting and visit from the day before, showing that they had all been OK with the message problem by the time the visit ended, in dispute of the facts that they related to him.  He stated "Well…I guess I need to have another talk with Mrs. Rhinehart, huh?"  C.B. agreed and hung up.  C.B. never heard anything more about it, and no charges were ever filed.

18. In late September, C.B. gained employment, and kept the job for six months.  He cleared a $1200 monthly, in addition to the mother's income.  On October 1st, 2014, the parents acquired an apartment, complete with expenses (electricity, heat, etc. Neither of us were ever asked to fill out another financial affidavit. DHS refused to acknowledge that we had gotten an apartment, and testified and reported several times in the days that followed that we claimed that we had an apartment, and that she (Katie Gosch) had never been to this apartment to verify that.  At no time did Ms. Gosch ever inquire of us about our apartment, nor did she ever ask to come over to verify that we had one.  On October 16th, C.B. filed a change of address with the court.  All court documents from this time forward until our termination of parental rights came to this address; including our entire case file, sent to us by Dale Mays. The only thing that did not ever arrive was our file from DHS, which we requested from Katie Gosch three times - by message, by phone and in writing, all before the termination of our rights.  By statute, should we demand these records, they are to be given to us.  We would testify to Judge Price that we had acquired an apartment in October at our December 11th hearing to hear motions that I had filed, and informed him that we had filed a change of address with the court.  He stated "I don't pay attention to things like that."  In the order for our Dispositional hearing,

filed October 21st, 2014, Judge Price would list "continued homelessness" as one of the primary reasons T.B. "shall remain in out-of-home placement." The other reasons, of course, were the fact that we "refused to engage in (his unnecessarily ordered) services", i.e., drug abuse assessment AND treatment (like he already knew what their assessment result would be) and mental evaluation AND treatment (like he already knew what their evaluation would state us to be in need of;) and parenting classes (C.B. had, by this time, raised three boys into their 20's, and was teaching the mother everything she needed to know.) Those reasons would be used in every hearing following the adjudication hearing.   Also, according to statute, Judge Price is to ask us, in every hearing, if the services the court was offering us were sufficient.   In the adjudication hearing, we stated that they were. At no hearing that followed was this question asked of us, nor were we usually there to answer it.   Had we been there, we would have answered with a resounding "No!", as we did in our affidavit, filed by E.B. in the case, entitled "Affidavit of NO reasonable efforts made", on February 12th, 2015.   That affidavit cleared up any answer that we might have given, or did not give.

19.   Twice, during the course of these proceedings, once in December, prior to the first motions hearing held on December 11th, 2014, and again one day before the permanency hearing, on January 14th, 2015; a motion/notice was filed to the court NUNC PRO TUNC; rescinding all signatures on all documents that E.B. had signed, for the courts, for DHS and for her attorney; whether under duress, or without knowing what she was signing.   Judge Price, both times, would shirk this motion/notice and throw it to the side with the intent of forgetting that it had ever been filed.   It did not show up in my re-download of all of our documents from the case from December.   C.B. believes it has been removed from the record purposefully and permanently.

20.   On October 21st 2014 at the Dispositional hearing; Judge Price, using the financial affidavit Attorney Mays had the mother fill out on September 5th, 2014 (showing the mother to be homeless and having no expenses), would then order E.B. to now be financially fit to pay for her court appointed attorney.   Later, after telling Dale Mays that we didn't want him at our hearings or to represent E.B. anymore; and, since my access to the record was still blocked; we then requested a copy of

everything he had on our case.  He informed us, in an email responding to this request, that this would be quite expensive, and that he would have to bill us to do that.  We told him to forget about sending our file to us, and that we'd find another way to get these documents.  He sent it anyway, with his bill included in the package.

21.    Katie Gosch and CFI's visit supervisor, Ashley Andrews, between September 12th and January 15th, 2014, would downplay every effort made by E.B. and I to have our daughter returned to our care, and both continuously spoke badly of us - on the stand in court and in their reports.   Mrs. Andrews and her supervisor continuously reported us as not able to be good parents, falsified all reports to the Department and the courts, claiming all the while that either of us EVER learned to properly change a diaper, or properly put T.B. in a car seat, two things they used unerringly, in every hearing, to claim E.B. as an unfit parent.

22.    On December 11th, at 11:30, we attended a hearing that was set in order to hear approximately 10 motions C.B. and E.B. had filed.  One motion C.B. had filed concerned a motion attorney Mays had filed a couple days prior to this hearing that asked Judge Price to withdraw from E.B.'s case...again.  He had listed reasons in it that were untrue (one stated that he had the mother fill out another affidavit in order to have the court determine that she was unable to pay for her attorney and to have it paid for by the state; something that was already in force due to the first affidavit, filed prior to this) and, because we had misunderstood his intentions, we had gotten angry with him and asked him to withdraw) making himself look like an angel, and us parents like mental patients.  C.B. had, after this motion had been filed, prior to the hearing, filed a motion to correct his motion, in order to have him list the actual reasons for his withdrawal request.  Judge Price, in order to protect attorney Mays, as well as cover his own involvement in what Dale had done against his client's best interests; first, dismissed Attorney Mays from the case, then, threw out CB's motion to correct the facts of his motion and the record; claiming it was now moot, because Mr. Mays was no longer associated with the case.  Later, in the middle of a motion that involved addressing the issue of the DHS and those of CFI attempting to have him arrested for harassment; Judge Price interrupted him mid-sentence and loudly yelled "Lunch!" at exactly 12:00 (only 30 minutes after the hearing had started), then continued the hearing for a week later.

23. As it seemed obvious that we would never receive justice under Judge Price, or get our daughter returned to us; C.B. called Kevin Brownell, the Assistant Polk County Attorney in charge of the case, on December 17th, 2014; presenting to him that he had decided to stop fighting, and that he now wished to go with the services that were ordered of them. He did this as a favor to the mother, hoping to, possibly, turn around what seemed to be inevitable, the loss of our daughter.

24. On December 18th, 2014, following a 2nd continued hearing to hear motions that C.B. and E.B. had filed; DHS's Stephanie Rhinehart and Katie Gosch asked to speak to C.B. before he left, concerning his "change of heart." They then re-iterated the terms of our future interactions, and repeated the services they wanted us to engage in (included here were accusations of our drug addictions; and that we would agree to drug treatment for our problems). Ms. Rhinehart then introduced C.B. to a man he had seen her and Ms. Gosch sitting with, during the hearing. He was told this man's name was Tony Reed, and that he had come to do a field urine test on him for drugs. C.B. would later discover that he was not just anyone, he was the current manager for all of the testing centers in Iowa, including Central Iowa Family Services in Des Moines. He had come, he stated, because C.B. had served a subpoena on his testing center for someone (no one in particular) to come and appear on their behalf. C.B. told him that he had also asked that someone to bring along specific documents, and that he saw that Mr. Reed had not brought any along. He then mentioned that, because of a change in plans, that he had not required his testimony, after all. Mrs. Rhinehart would then tell C.B. that his wife was to do a field urine drug test just as soon as she got off work, at Central Iowa Family Services. This had not been ordered by Judge Price, nor was it requested of C.B., or mentioned that it would happen after the hearing by Mrs. Rhinehart until the hearing was over, and we were all outside of the courtroom and on our way home. In an effort to be compliant, I immediately agreed to do it, with no argument.

25. Since C.B. had just used the restroom prior to our hearing, and wasn't ready to ubmit a sample just yet, he informed Mr. Reed of this, and he stated that he would wait, and that C.B. should drink some water. While they waited, C.B. engaged in explorative conversation with Mr. Reed, relating to him the events of his hair follicle testing, and described the place to him; not knowing yet who he actually was, or his position. C.B. described how that first test had gone, and how the place had looked.

Mr. Reed became visibly ruffled, and stated that he worked closely with those of that facility all of the time; and made it clear that it had NEVER been like C.B. described.  Knowing then that he could not trust this man any more than where he had done his first test, C.B. decided to play Mr. Reed a little, to see just how far DHS and he would take things, in order to keep C.B. down.  C.B. then lied to Mr. Reed, by pre-warning him that it would be very likely that he would test positive for drugs in his test.  Mr. Reed stated that they would see about that, soon enough. Five minutes later, while C.B. paced, he feigned a slight move towards one of the (locked and inaccessible, either in or out, and unmanned by the Polk County sheriff) courthouse doors, and Mr. Reed quickly moved to block his way out, then stated that there was no chance that he would be getting out of doing this test - as if he had the power to force him to do it.  C.B. laughed and told him that he had no intention of missing out on it, and told him he was ready to do it.

26.    C.B. submitted a sample, and watched what Mr. Reed did following that.  After watching for a moment, he asked Mr. Reed if he would tell C.B. exactly what happened in the test, how the cup worked, or determined I was positive, and for what.  Mr. Reed blithely described how the test worked, in full detail, and told me how he would determine a positive and for which drug, had he been the tester.  He then asked him what his results were; and Mr. Reed began turning the cup away from C.B.'s view, took out his phone and started taking pictures of the cup.  He stated, "I'll be sending Ms. Gosch pictures of your results, and it will up to her to tell you what your results are.  Mr. Reed then had C.B. pour his sample into a smaller container and told him to seal it, telling him that the lab would test this portion of it.  He then had C.B. throw the original cup in the trash.  Neither Mr. Reed nor C.B., at any time, wore gloves.  Mr. Reed then stated that we were finished, and that C.B. was free to go. After Mr. Reed left, C.B. went back into the restroom to attempt to retrieve the testing cup.  The trash can in the restroom was locked, and my arm was not long enough to reach into the bottom of it.  I then dropped my keys into the garbage, and told a sheriff that I had accidently lost my keys while reaching for a paper towel, and asked if someone would let me into it.  He stated that he would do it for me; and when we arrived, I got my keys, and removed also the cup that I had thrown into it.  As I got into my car, I looked at it.  None of the things that Mr. Reed had described as occurring in the test results had happened.  The cup was inactive.  No result showed on it at all.  To verify my theory of what I

thought was about to happen, C.B. called Katie Gosch, and left her a voice message to flush out her part in the deception. C.B. stated that he had come up negative for drugs, and passed. He then went to pick up his wife from work and took her to Central Iowa Family Services, where the claimants had tested previously in their first tests. On the way, C.B. told E.B. not to do a test unless she could have a witness to it. After she went in, Katie Gosch called C.B. back, and began to tell him how his drug test had come back positive for meth again. C.B. hung up on her mid sentence and waited for his wife to return.

27.   When E.B. returned, she informed C.B. that she was not allowed a witness to her testing, and didn't do the test. C.B. then told her to get her things, and that they were leaving. When she returned, she had, in her hand, her unused field testing cup that she had picked up with her things, accidently.

28.   Upon returning home, C.B. did another test in the mother's unused cup. It came out exactly the same as the one he had thrown away at the courthouse...inactive, with no results, positive or negative. We then realized that this had been a trick to make us look dirty for drugs, guilty of abuse, and in need of the court's services, as well as gravely in need of the drug assessment and treatment services we had been ordered to engage in unnecessarily, by Judge Price. C.B. immediately took pictures of the two cups, one of the cup that he had just done the test in (with the sample still in it); wrote an article about these events and posted it on my blog, knowing Ms. Gosch would eventually read it.

29.   On January 2nd, 2015, an order was filed in the case by Judge Price, granting Attorney Mays (again?) permission to withdraw from the case, and stated the effective date for that permission to be December 15, 2014, half a month earlier. This effective date was four days following the initial one of two motions hearings that had been held on December 11th, 2014, in which Judge Price had, at that hearing's onset, granted Attorney Mays permission to withdraw from the case supposedly effective THAT day at THAT time. Price would then dismiss attorney Mays from the courtroom, and, following this, subsequently threw out a motion C.B. had filed to correct Mr. Mays' motion, claiming his motion to be moot, because attorney Mays was no longer associated with the case. Then, C.B.

remembered that Mr. Mays had been served a subpoena to testify at the second continued motions hearing, and it was served by C.B. on Mr. Mays on December 15th, 2014.  Immediately following this service, Mr. Mays then electronically filed a motion to quash the subpoena in the case, although he supposedly was not associated with the case.   On January 15th, when C.B. was removed as a necessary party to this case, he was un-indexed from the electronic filing system within a half an hour.   Judge Price ordered this almost immediately.  C.B. most certainly was not able to do what Mr. Mays had done, four days after his removal from this case.

30.   C.B. did not bring the matter of Mr. Mays being able to file in our case after being dismissed from it until January 22nd, in his answer to the permanency order.  C.B., after noticing this order in his downloaded case files in January 2017, had thought it strange that he'd never seen this order, or received notice that it had been filed. This order, filed on the 2nd of January, 2015, looks as though it was submitted as a definite after-thought, very obviously filed in order for Judge Price to cover Judge Price's mistake in covering for Attorney Mays, then allowing him to continue to be electronically able to view and file documents in the case, though he was no longer associated with it, per Judge Price...and yet...though it was submitted by Judge Price on January 2nd, 2015, more than 2 weeks after this matter occurred, (which is, by itself, strange enough), the matter wasn't noticed by C.B., nor was it brought up, or addressed by C.B. until January TWENTY second, in my answer to Judge Price's order over a month later than the December 11th hearing, and over a week later than the order for permanency.

31.   Later, on January 9th, a report was filed by DHS, authored by Ms. Gosch; her final report to the court before the determination of permanency.  As C.B. had expected it would, contained an alternate version of the story C.B. had told on his blog, and details that he described there were meticulously covered in exact denial of everything he had written, showing that they had obviously read his side of the story.  Ms. Gosch would refer to Mr. Reed relating these events to her.  First,

according to Mr. Reed he was the only one who ever handled the testing cups, and it was he, during the test, who, after getting no results, determined that the cup he used in C.B.'s FIRST test sample was inactive, and therefore, defective; and that it was he that threw the cup away in the garbage.  He then stated that he got another cup out, and acquired a SECOND test sample from C.B. (remember - C.B. was, at that time, barely able to provide enough for a first sample), and that he had also been the one to throw the second cup away, after the results of that test.  When C.B. had retrieved the cup from the trash later, Mr. Reed stated that C.B. must have grabbed the defective one that he had thrown away from the first sample.

32.   After addressing this in her report, Ms. Gosch went on to describe the calls C.B. had made to both her and Ms. Nieman on January 5th, 2015, then boldly lied to the court and stated that, in Ms. Nieman's messages, C.B. had threatened to kill her. NOTE: The transcripts for these voice mails were filed by DHS in BOTH of our juvenile cases, on January 7th, just two days after they were made.  There was no message to either that described, related, or repeated any of the words that Ms. Gosch would claim were stated to Ms. Nieman, nor was that threat even insinuated).  Also submitted towards this hearing were C.B.'s lab results, from the drug testing sample he poured and sealed without gloves; and that Mr. Reed had, allegedly, sent to them.  An abuser of meth, someone that uses it daily, comes in at a test result of approximately 2-3000 ng.  C.B.'s results on Mr. Reed's lab form showed a rather staggering result of 21,000+ ng.  C.B. investigated this result, to find that one would have had to have shot up an ounce of meth just minutes before the test to come in with this result; and would have, more than likely, been dead by the time they finished giving their sample.  NOTE: C.B. believes it quite important to mention that Mr. Reed's facilities in Iowa put around 1800 parents through their unsanitary and generally unprofessional drug testing centers collectively, every month.  Iowa's children are dependent on these test results, and parents are depending on DHS to return their children.  One test, done on C.B., was falsified. Even with the original evidence destroyed, C.B. has clear and convincing evidence of this.  The very first drug test done on E.B. had to be re-done, because they collected too much fake hair with her real hair.  Her fake hair was the opposite color of her real hair, cost around $.97 a metric ton, and looked like straw.  It was also blonde.

If a place takes hair samples for drug testing, they should at least know the difference in real and fake hair, especially if one is bright yellow, and the other is black.  If Anthony Reed's facilities falsified or screwed up even one test or its results, it's possible they screwed up or falsified 100; or maybe 1000, maybe more. Iowa's children are depending on these centers to do the right thing, so that they can go home to their parents.  These centers need to be shut down, and Mr. Reed needs to go back to his first position in Iowa, as a JCO.  DHS, by the way, is his ONLY contract.  It should be obvious why.

33. The determined "biological father", R.S., had sex with  E.B. only once, in January of 2014, while the claimants were briefly separated, and, after that, wanted no more communication, and nothing more to do with E.B..  After the claimants reunited a month later, and after C.B. discovered that she was pregnant, she informed him that she didn't know exactly who the father was, since she had relations with two men during this time, and one had died.  When it was determined that J.B. (the possibility that was dead), who the mother thought WAS the biological father of our daughter, was determined to not be the father, DHS then pressed E.B., and eventually pried the name of the other possible father, R.S., out of her.  As soon as they got his name and where he was possibly living, the department then hunted down the biological father, R.S. of Newton, Iowa during the course of our juvenil cases, and had him also do a paternity test.  The results would show that R.S. was indeed the biological father of T.B.

34. After a paternity test proved that R.S. was the actual biological father of T.B., the petition to terminate, not just our rights, but the rights of the biological father, R.S., as well, was filed in the newly formed termination case on January 9th, 2015.

35. On January 15th, 2015, after we left our permanency hearing, Judge Price, in a surprise move, would order that R.S, who hadn't even been officially involved in the case at all until that day, should, as T.B.'s real father, get the same chance that C.B had to be compliant with what DHS would ask of him (which was nothing compared to what they asked of us, was infinitely simpler for someone to accomplish, and would require very little effort on R.S.'s part) and then awarded him full unsupervised visitation with his (our) daughter.  After we had acquired an

apartment, both E.B. and I would ask DHS and motion the courts SEVERAL times for, at the very least, supervised visitation in our apartment, as well as re-allow me my visits T.B., without DHS's ridiculous stipulations.  Each and every motion and request was denied or ignored, depending on who was getting the request or motion. As a matter of stated fact, after the date of September 12th, nearly EVERYTHING, especially various things filed in our case, were not addressed, were completely overlooked, not noticed, never answered, ignored, and outright thrown away or destroyed.

36.  In the order for permanency, issued January 15th, 2015, stated that the parents abandoned the hearing, and all the motions that were filed in it; when in fact, we left the courtroom because Judge Price had thrown C.B. out as a necessary party (and, naturally, all of the motions that C.B. had, allegedly "abandoned"); and after E.B. ordered Judge Price to recuse our case, due to bias, and he refused.  What isn't mentioned is that Judge Price ordered the Polk County Sheriff to retrieve E.B. after we left, and drug her back to the courtroom, so that he could address the only motion that could be problem for him, had he not addressed it - the motion for intervention by the Cherokee Tribe.  Since Ms. Nieman had effectively deprived E.B. of that possible intervention for nearly six months by falsifying her removal document, Judge Price knew he'd have to address it promptly.

37.  On January 21st, 2015, Katherine Walker would appear in the case to represent R.S.

38.  Immediately following her appearance, C.B. contacted Ms. Walker at her firm; not only to warn her about what had occurred involving us up to that time, and warn her not to trust DHS or Judge Price, but also to inform her that a petition to terminate ALL the parents' rights, including her client's rights, was already in force.

39.  On January 25th, 2015, Ms. Walker filed a motion to continue the termination of parental rights hearing.  On it, cited as one of the reasons for the continuance, was that Ms. Walker could not possibly attend on that day.

40.   On February 19th, 2015, suddenly, in the final hour, the petition to terminate
parental rights was amended to disclude R.S. from his parental rights being
terminated.  A flurry of reports were filed from seemingly nowhere in just a matter
of a few days, from both DHS and CFI; all praising R.S. and his most
apparent wont to be a father, and about his total compliance in going along with all
that DHS asked of him willingly (which, at this time, had been only visits, the
paternity test, and a drug test - things we had ALSO done, willingly), and
portraying him to be a saint, and very nearly God-like in his parenting style and
skills; in order to get them placed there in time for the all-important
termination hearing...which, by the way, it's important to note that Attorney Beth
Walker was, after all, miraculously able to clear her calendar in order to attend on
her client's behalf, at the very court and hearing she had motioned, just days before
this, stating she needed a continuance of the termination hearing, because it was
"impossible to attend on that date".

41.   On February 20th, 2015, Ms. Rhinehart, Katie Gosch and Emily Nieman
would again allege that C.B. harassed both Emily Nieman and Ms. Gosch, and,
according to Jake Lancaster of the Des Moines Police Department, the detective
who had called him, they now intended to claim that he had been harassing them
all since July of 2014.  After several harassing phone calls to me from Mr.
Lancaster, (because he refused to stop calling me incessantly, at which time I chose
to turn my phone off), a warrant was then issued for my arrest.  Unbeknownst to all
that mattered, however, the claimants had decided by this time to move away (a
promotion in my job) to Carroll Iowa, without notice to anyone but my boss.  When
he couldn't find me where we had said we lived in Des Moines, or, where C.B. had
said he was working, Mr. Lancaster then took to visiting and harassing C.B.'s
relatives in Des Moines, by coming by their homes constantly to ask if they knew
where he was.  He did not stop this behavior until the time C.B. was finally
arrested, almost a full month later.

42.   The warrant for C.B.'s arrest contained these charges: Harassment in the first
degree (this charge concerned the "threat of Ms. Nieman's life" on her voice mail,
something that never happened), an aggravated misdemeanor, and two other simple
misdemeanors, also for harassment, but in the 3rd degree instead, one for each of

the two workers. The "victims" were Emily Nieman (he called her one time, during the period of July 2014 until that day, January 2nd, 2015), on the weekend, to relate to her that he was about to win because of what he had filed for the Permanency hearing, and that she was likely to lose her job; and Katie Gosch - who was, at that time, still our active DHS caseworker - the same day, on the weekend, when C.B. knew it was likely to leave a message, and said pretty much the same thing to her. Prior to that, C.B. never had the desire to even see Katie Gosch, let alone did he ever speak to her, if he could avoid it. The calls were made on January 5th, 2015. The charges were filed a month and a half later. Upon filing these charges, because Mr. Lancaster was most anxious to find C.B. and arrest him, The DMPD would then place C.B. in the NUMBER #1 POSITION of the "Metro's Most Wanted" website and on Facebook. This segment also ran in both CityView magazine and was also aired on Channel 13th's news broadcast every week. C.B. was the #1 wanted criminal in the area there for well over a month, until and even a week AFTER he was arrested (they then just put up his mug shot and put the word ARRESTED over it). Because of his fear of being arrested at this critical time, with a very important assessment appeal coming up, and another obvious appeal on the way, the claimants decided it was in their best interest to NOT attend our termination hearing; as was their plan.

43.   On February 28th, 2015, our rights were terminated, and R.S. would go on to be the real hero and father in T.B.'s life, even though it was more than a year after he had irresponsibly shunned and shut out the mother, not caring to even check up on her afterwards, just in case she may have gotten pregnant with his child. Instead, and only after DHS hunted him down to tell him that he had a daughter, R.S. raised his finger at the last minute to claim her, after he had fought and was the court's target in his stead as her father for six straight months. Our daughter was in foster care from July 2014 until February of 2015, when the mother's rights were terminated. C.B. was removed from the CINA proceedings in January, 2015 by Judge Price the because of his paternal status (the non-biological LEGAL father), and his "lack of any rights to be a party of interest in these cases"; and yet the same rights that he supposedly didn't have to be an interested party in the matter of T.B., in the CINA case were terminated in our termination hearing by Judge Price in February of 2015, a month and a half later.

44.     This claimant brings that reunification was NEVER the intent, either of the
        DHS, or the courts that supported them and their illegal and unlawful actions
        entirely; no matter how ridiculous their lies got, no matter how wrong their
        retaliatory and vindictive behavior was in turning against the claimants.  The
        claimants also claim that ALL, that had been involved thus far, and even R.S.'s
        attorney, conspired with Judge Price, the DHS, and all at the county attorney's
        offices to make sure T.B. went somewhere, ANYWHERE…and to ANYONE, as long
        as no one gave her back to the long married and loving parents who wanted her to
        begin with and still do, and who had fought against this, and to have her returned,
        quite literally against all odds, for 6 long, traumatic months.

45.     Concerning the arrest for harassing Ms. Nieman and Ms. Gosch - because C.B.
        couldn't be located, and since no one that knew C.B. would turn him in (mainly
        because they all knew he would never do what was alleged here), the DMPD and
        the County Attorney's offices would turn to others in Government who might help.
        After perusing C.B.'s entire blog, they found a single sentence that they could use,
        that stated "I'm going to Washington D.C., and I'm going to camp out on Obama's
        doorstep until he does something about corruption in Iowa." They then turned this
        over to the Secret Service, somehow convincing them that C.B. was a credible threat
        to the President of the United States.  They did this because this agency had access
        and authority to ways that they could legally use to find C.B. that the DMPD and
        the County Attorneys did not.  The Secret Service agent assigned then located C.B.
        by his IP address, and had him arrested finally in Carroll, Iowa.

46.     Upon my arrival in the Polk County Jail, the Secret Service agent interviewed C.B.
        for 2 minutes, then walked out on the interview after he discovered that this was all
        about his stolen daughter, and determined that he was hardly a credible threat to
        anyone; let alone the President of the United States.

47.     C.B. appeared before Judge Birkenholtz, District 5C in the morning and plead
        guilty to the two simple misdemeanors, in order to bring bail down to an amount he
        could pay, and in order to get back home to work on this case and my appeal.  Much
        later, when the issue of the aggravated misdemeanor of harassment in the first
        degree was pressed to the limit by me, prior to trial (long after my arrest, and well

after the termination hearing), the charge was dropped suddenly, with prejudice, on April 15th, 2015; just a few days prior to trial. The victim impact statement and the pecuniary damages statement were both filed AFTER the charges were dropped, on April 29th, 2015. They had never had proof of this crime, and claimed that they dropped the bigger charge (where C.B. threatened to kill someone) because he plead to the two lesser charges (where he just simply harassed someone somewhat to make them a little nervous, a rather major difference of 2 huge upgrades in misdemeanors) – even though the pleas had occurred nearly a month earlier. Later, it was determined, after reading our termination appeal's cross appeal, that this arrest warrant for me was issued when it was for a very important reason. Throughout the cross-appeal, it mentions over and over again (I counted like 20 or so times over a spread of like 5 different filings by the Attorney General's offices) that, because we did not attend our termination of parental rights hearing; and, also, because C.B. was no longer considered to be an interested party in the CINA case, that neither claimant had any standing to appeal the matter to the Iowa Supreme Court.

48.   On July 5th and 6th, 2015, an appeal to the child protective assessment of the parents was held in front of an ALJ, at the Department of Human Services. Grant Dugdale of the Attorney General's office defended Ms. Nieman. The ALJ ruled in our favor on all matters, and ordered that our records be expunged, and that we be removed from the central abuse registry. The matter was then appealed up to the Director of the Department of Human Services at that time, Charles Palmer, and he would uphold the same ruling, again in our favor. Emily Nieman, the social worker that removed T.B., testified in our assessment appeal that she had no experience with newborns at that time, and that T.B. had been her first removal of ANY child from a family. Also during this hearing, Mr. Reed of Central Iowa Family Services would claim that, when he appeared at the hearing he was subpoenaed to testify for, on December 18th, 2014, that he didn't even know who either Katie Gosch or Ms. Rhinehart were; and had just met them just after the hearing; though it was Mrs. Rhinehart who would introduce us, prior to my field test for drug use. This testimony, if true (which of course, it is not), would then indicate that Mr. Reed, because someone (not him, specifically) had been subpoenaed to come and testify at this hearing, dropped all he had going on (as a JCO, and the manager of each and

every drug testing facility for DHS in Iowa), drove 74 miles from Eldora Iowa to Des Moines, and showed up personally - for no other stated reason. Then, just for fun, he happened to have a drug test handy, and at the request of these ladies that he had allegedly just met, agreed to drug test C.B. while he was there; and report the results to DHS. like this is something he does all the time. C.B. states, as fact, that Mr. Reed and Ms. Rhinehart, along with Ms. Gosch, had already planned this well ahead of time; and Mr. Reed showed up personally, because he wanted the chance to get me back. Because of my article describing his operation after our first drug test, and had put it up online, Mr. Reed was forced to completely renovate his operation in Des Moines.

49.   The claimant claims that the transcripts to the termination hearing are a complete fabrication. Paul White, the GAL, never said more than two words in any one hearing; yet waxed on for a full 3 pages in these transcripts. This alone is enough to convince the claimants, let alone the numerous pages of heartfelt words allegedly spoken by Judge Price, a man who never had a single kind word or feeling for anything or anyone, ever; and whose words fairly dribbled with condescension and sarcasm at all times, at least towards any who would dare speak to him from the floor of his courtroom. Anyone who had been in a courtroom with any of these people would, just by reading what was said, instantly know that no one had said anything allegedly said in these transcripts.

50.   On appeal to the Iowa Appellate division, the Appellate court blatantly refused to stay our terminations based on the assessment appeal decision of the ALJ and the Director of the Department of Human Services, even though these decisions more than determined that, initially, the child was wrongfully found to be in need of the removal, and in need of the court's intervention; and that they made a mistake taking her from us. This decision of the Department should have, by all logic, nullified anything that was decided afterwards, including all orders given by Judge Price from the time of the removal, on. These decisions of the director and the ALJ were submitted 3 times, and the appellate courts would deny the stay 3 times, long before they would even consider the case. They would also refuse to pay for transcripts that concerned anything other than the termination hearing unless we paid for it ourselves, which came to around $1,000. This order came out just 2 weeks before they began their consideration of it, giving us no time to get the money

together to pay for them.  Naturally, they would then rule in full agreement with the district court; and in total disregard of all of the district court and Judge Price's unlawful actions against us.  New evidence (the 18 minute recording of the worker breaking several federal laws in removing T.B. from the mother) was then entered by us into the case.  This same evidence had been filed in our juvenile cases, but was never admitted by the State's juvenile clerk of court employees into the record, nor filed for six days, more than likely because all of the evidence and motions I had filed for the permanency hearing would have completely destroyed the State's entire case and the district court would have been lawfully forced to return T.B. our care and admit that all they had done was wrong.  The appellate court followed the District Court's lead, refused to admit that all the courts and those involved had done was wrong, and would then officially reject this new evidence, and ruled that it was nothing short of a sad attempt by us to get them to reconsider their final decision, even though such "new evidence", in a court of criminal proceedings would have been powerful enough to warrant a whole new trial.  This decision, of course, came to us almost a full year and 3 months after we filed it, very nearly almost 2 full years of the very first part of our daughter's life.

51.   Finally, concerning the Iowa Supreme Court appeal, the claimants believe that the matter of our case and all the atrocious behaviors and actions of all who were involved in unison against us and our claimed inalienable rights as parents, involved against us, in order to, initially anyway, claim that we were unacceptable parents and people in every imaginable way, in order to seem justified in later terminating our rights, then place our daughter out to the foster parents, who we're certain, had their eye on her and didn't rule her out as a good addition to their ever growing adoption income.  We're also sure that they were DHS's first and foremost choice for placement, but DHS had to take a lawful detour when someone of the family, closely related by blood (R.S., the biological father) came in, however late armed with a real paid lawyer (one not in on the scheme...until the termination, anyway), who had a salary that was acceptable to Judge Price (among his first questions of R.S. at the permanency hearing were – " Where are you employed?", and "How much money do you make there?"), then their plan was forced to change. R.S., who is a single working parent, with a criminal record (unlike either of the parents at this point) was considered to be a much better, as well as an above and beyond perfect choice to raise this child, over the married parents.

52.   Herein, then, concerning all these facts stated prior, It should not be difficult for this court to find that a most definitive meeting of the minds and conspiracy occurred between all that have been mentioned thus far in this Claim, as defendants.

53.   During the year and a half that we waited for the Appellate court to address these issues, C.B. had been continuously sending emails containing relevant news and clippings, recordings of legal atrocities, paperwork and proof of what was happening to our family, as well as things that were happening to other families all over Iowa, to Darren Tromblay, the Editor-In-Chief at CityView magazine in Des Moines, Iowa.  Emails were also being sent to all who had been involved in their criminal actions against us.  At no time during this period did anyone ever respond or ask/tell him ever to stop sending them these things, and Mr. Tromblay even began to respond to them favorably, from time to time.  Finally, in November of 2015, Mr. Tromblay would send me a reply to an email that I had sent him, and asked C.B. to give him a call.  He did, and he mentioned that he thought we could get a story on this, He would then mention that, since there were an awful lot of facts and elements to this story, that we would need to go through it all to sort out what we needed and what would he wouldn't be able to use.  He then sent me a follow-up email, signed with a digitally produced signature, that clearly stated his intention to send a reporter of his, Jeffrey Pitts, my way, very soon, in order to discuss what would give him for the story (no vagueness in the language, no "maybe"…that he certainly would do the story) Nearly two months later, in January, 2015, C.B. contacted Mr. Tromblay twice by email in quick succession to ask, somewhat angrily, what the big delay was, and mentioned that he had heard nothing from him or the reporter at all.  C.B. heard nothing back from Mr. Tromblay following those emails being sent out, and on January 23rd, 2016, members of the Carroll City Police, including Officer Greg Bellinghausen, were again knocking at my door.

54.   E.B. answered the front door, and with the door shut, asked who it was.  There were two officers present, and one identified themselves as the Carroll City Police. She then asked these men for their identification and a warrant of arrest.  They stated that there was a warrant for arrest, but that they didn't have it with them. She then told them that they would have to produce this warrant, and asked them to leave the property.  The officers then obliged her, and left.

55.   Posted on both doors of our home, at both the front and back doors, we had a sign
      that requested that all who came onto our property, purporting to be law
      enforcement or claiming to be associated with any government agency therewith,
      who came with the intent to enter onto the premises was required to produce official
      documentation that proved who they were, and their lawful purpose to come onto
      the property, with or without a warrant.  It also stated that, should they choose to
      not provide what we asked them for, and they should choose to enter the property of
      their own volition regardless, that in doing so, they would be contracting with C.B.
      to pay us a land use fee at a rate of $10,000 per person, per day, or any portion of
      that day.  This sign was printed in bold black and white, took up the size of an
      entire 8"x11" page, and was posted at eye level, so that none would overlook it.
      NOTE: On the date of C.B.'s 2nd arrest, just a few days after this arrest, the officers
      who came that day childishly ripped these signs off of my doors, prior to knocking
      on them.

56.   Upon their return 20 minutes later, the officers once again knocked at our front
      door.  E.B. then asked to see the warrant, and when she was satisfied that what
      they were holding was a warrant, she opened the inner door to our property.  The
      officers then moved to open the screen door with the obvious intent of contracting
      with us for our agreed upon land use fee, then entered the premises on their own.
      They then inquired as to whether C.B. was Christopher Bruce, as he was sitting
      right by the door when they entered.  He told them that he was not.  Officer Greg
      Bellinghausen would then step forward, and state "You ARE Christopher Bruce,
      and you're under arrest." He then handcuffed him, and took him to the Carroll
      County Jail and put him behind bars to await transport to the Polk County Jail by
      the Johnston, Iowa City Police Department.

57.   This arrest took place in the afternoon on January 23rd.  The transport from
      Johnston Iowa took around an hour to arrive.  The transport by the Des Moines
      Police Dept., a year earlier, had taken around an hour to arrive from Des Moines to
      Carroll, Iowa.  This is mentioned because the transport that happened following the
      arrest two days after this arrest would take 4 and a half hours to arrive from the
      Des Moines, IA area to Carroll, IA.

incarcerated (C.B. was arrested again almost immediately after he bonded out for this case, and was then sentenced to do a full year in the county jail) that the warrant used to arrest him, supposedly in the possession of the Carroll City Police Department; and, more specifically, Greg Bellinghausen, was NOT an arrest warrant, but was a search warrant. At no time did officer Bellinghausen "search" any portion of the property. He came in, made his false identification of C.B., arrested him without verifying his identity, and did not ever touch anything else in or on the property. This warrant, is no longer the warrant shown in this case, and cannot be accessed or downloaded by the claimant from Efile.

59. The claimant presents that Officer Greg Bellinghausen was in charge of the operation resulting in my arrest at our property, and is wholly responsible for the debt he incurred by contracting with us, the current residents of the property at that time, the claimants, by willfully entering our home of his own volition, though duly warned of the consequences, and without invitation, and using an illegal warrant to do so. We have concluded this as fact, in that a. He had been the first and only officer to speak the entire time, b. had accepted the liability of C.B.'s welfare by taking the action of placing him in handcuffs in order to complete this unlawful arrest; and c. there were, at final count, two officers who had entered the property at that time; and, thereby, officer Bellinghausen did, by engaging in these actions, choose to claim responsibility for the intrusion onto our property, and is in debt to us for our land use fee in the agreed upon total amount of $20,000, upon our demand, and in legal tender. We now so demand.

60. Important to note at this time, that there were several strange occurrences, all pointing to actions taken specifically by the County Attorney's offices. On or around April of 2015, until the present day, emails that were being sent to them would be opened by them at, say, 9:00 a.m. in Des Moines, Iowa. Five or so minutes later, at 9:05 a.m. the same day, the same email, would be opened by the same county attorney in Omaha NE. C.B. has a program that tells him where all of his emails are being opened, by whom, and how many times, and when. he then started noticing the same emails being opened in other major cities: Kansas City, Minneapolis, St. Louis, MO; all cities in the immediate and close vicinity of Des circle of cities has gotten wider and wider with every passing month. Upon doing

some research, it was discovered that not only had C.B.'s computer been connected to these same cities in his network connections (on his personal computer), but that Facebook and Google were continually giving him alerts, stating that these locations were also logging into his computer and accounts online. Upon further research, it was discovered that every city listed had a rather large branch of the FBI located in it. (There was, by the way, a year's reprieve, during the time C.B. was jailed.) Upon recently sending certified letters of settlement (prior to this action, something normally done by attorneys or pro se litigants who are about to file actions in federal court) to the County Attorney's offices prior to this Claim, there were again openings of C.B.'s emails occurring as far away as Massachusetts, after a year of not seeing any activity, and just after it was certain that they had, on the same day, received them certified mail. It is stated by C.B. that, in order to get him off his case, the County attorney has taken to calling just about every office branch of the FBI in the last three years, in an attempt to have him federally arrested, for no real crime committed.

61. On the date of January 24th, the day following C.B.'s bonded release for the harassment of Darren Tromblay, the claimant posted a story concerning Theodore Booker, a fellow warrior against child trafficking, and posted it on his blog. Upon investigation of the website for the DCFS offices in Los Angeles, he located a folder containing the names and email addresses for every social worker in L.A. county, CA. After posting Theodore's story, C.B. then emailed every one of the 8000 social workers that worked for DCFS, to let them know that their crimes against Theodore Booker were online for the world to see.

62. On January 25th, C.B. had involved himself in a case in Carroll County, where he resided, where a child had been wrongfully taken from a family. On the same day, C.B.'s friend, Theodore Booker, was arrested in L.A. County, for no charges that were ever filed against him for 7 months, using affidavits filed by those of the LA County DCFS offices, and that had C.B.'s name on them. Mr. Booker was released few months later, with no actual charges that were truth, and, of course, no real conviction.

63. On January 26th, 2016, The Carroll Police showed up at C.B.'s house again, with a

warrant for his arrest, using a single aggravated misdemeanor charge of harassment in the first degree, with the alleged victim being one Jeanne Munson of Altoona, Iowa.  This incident with Ms. Munson had allegedly occurred nearly a month before the charge was approved by the county attorney's office in Polk County, and it had, also, been nearly a month after the police in Altoona, Iowa had filed the police report alleging the same crime.  It's obvious that, if this had ever been a crime that C.B. would have someday been arrested for, it would have happened long before this date, or would have been brought against me while he was already in custody, just a couple days before this, for his alleged harassment of Darren Tromblay.  This arrest most certainly occurred because of what had happened with the DCFS offices in Los Angeles, as well as what had already occurred in C.B.'s newly formed war with his local DHS office in Carroll, Iowa.  Since they couldn't rightfully charge C.B. with speaking freely, or accuse him of using email addresses that he'd found in a folder that was publicly available on their website, they instead scoured his blog (C.B. had listed, at the top of every email he sent out, the address to his blog) to find the person who would appear to be his most troublesome enemy in his state, and who was mentioned in nearly every article he'd written about our cases: County Attorney John P. Sarcone.  They then contacted him for help in dealing with C.B. in Iowa.  Sarcone, in turn, would then search records of the reports filed by surrounding police departments, in order to find a report of some crime they could charge him with.  Hence, the involvement of the Altoona Police Department, and their contrived "victim", Jeanne Munson, came to pass.  C.B. would later discover that Ms. Munson had been involved in a deal with Charles Palmer, the director of DHS, and had been working with him in order to cause dissent in her Iowa-related group on Facebook, called "Protest Iowa."  Her job had been to subvert those that sought her help, as well as discredit and slander others that they might seek help from.   The Department had removed Ms. Munson's grandchildren from her care at some point prior.  It was then that Ms. Munson had started, and had become the administrator for a large group of 9000+ parents that had been leading the war with others that had also been wrongfully victimized by DHS in Iowa.  Charles Palmer had, along the way, sought Ms. Munson out, since she was the administrator of the only Iowa group against him, and made a deal with her, offering her and others to once again be allowed to visit with their children and grandchildren; and in exchange, Ms. Munson, her boyfriend,

Mark Worthington (a bail bondsman in Des Moines), and Linda Downs (these were
the agents we knew of. It's likely that there were more than this) would give the
victims of Iowa DHS mis-direction in legal matters, and cut them off from people
who were legitimately attempting to help them by slandering them in their group,
like C.B. for instance; which duly served to explain to him why Ms. Munson and he
had all of a sudden come to war against each other; after an amicable relationship of
nearly a year, prior to that time. As even more proof of her collusion with the DHS,
Ms. Munson, after heading up this Facebook group for years, would, after the
conclusion of my proceedings (and after C.B. provided enough proof on Facebook
showing her, Mark Worthington and Linda Down's collusion with the DHS and the
County Attorney in having C.B. arrested, then placed in the Polk County Jail for a
year) suddenly shut down "Protest Iowa," and her and Linda Downs were never
heard from in this medium again, though both were large in the fight to begin with.
Mark Worthington still, to this day, harasses C.B., and no charges have been filed,
though he has been as guilty, if not more so, of threatening the life of C.B. on
several occasions.

64.     Upon C.B.'s arrest on this occasion, there was only the Harassment charge; and
        C.B. was taken once again to the Carroll County Jail to await transport to the Polk
        County Jail. Strangely, unlike the other two times, where the transport took only
        an hour to arrive, this transport would take four and a half hours. The reason for
        this would soon come clear. C.B. had called Kenny's Bail Bonds, and found out that
        his bail for the harassment charge was just $200 dollars. He then told him he
        would give him a call once he arrived in Des Moines. While he waited, the Altoona
        Police Department would file two more police reports on C.B.; one for Stalking,
        another Aggravated Misdemeanor charge, and a Class D Felony, Threats. By the
        time he arrived in Des Moines and called the Bondsman again, his bond had shot up
        to $70,000, and would now require a home to guarantee his release. Under normal
        circumstances, C.B.'s bond should have been no more than $9,000 ($2,000 for each
        aggravated misdemeanor, and $5,000 for the Class D felony). This excessive bond
        was "justified", they said, because C.B. had an "extensive criminal history", which,
        at this time, included only plead to convictions of the two simple misdemeanors of
        harassment from the year before, and three other simple misdemeanors over a 42
        year lifetime, all unrelated.

As to other reasons this amount might be applied, C.B. has always shown up for court appearances, has never skipped out on bond or bail, had never been on or violated a parole or probation, and had never tried to elude those of law enforcement.  Most of all, C.B. had never contacted any protected party of any no contact order (i.e, Emily Nieman and Katie Gosch), even after the protection was lifted.  As to Ms. Munson and her claim against C.B., the claimant, while in commission of the alleged charges, called her several times on one day.  It had been months since he had last spoken to her, and C.B., to this day, has never contacted her since; so it was apparent that there was no real danger of the crime occurring again, should the claimant remain free.  Munson would later testify at trial that she was terrorized by C.B. and was in real fear of her life, but no charges were filed for a month, but did occur a day following C.B.'s emails to those in California, and also just after all that happened in Carroll, Iowa.  This arrest, then, only occurred as all involved and afore-mntioned, conspired against C.B. and, considering how he managed to bail out easily for the prior arrest, something more drastic had to be done to insure it didn't happen this time.  This unreasonable bail, then, was unconstitutionally imposed, in violation of C.B.'s rights under both the U.S. and Iowa Constitutions, concerning imposing excessive bonds/bails and fees.

65. On January 27th, 2016, C.B. would appear before Judge Carol S. Egly, in an initial appearance.  During this appearance, C.B. did claim that she did not have jurisdiction to hear his case, and challenged it.  C.B. also refused to enter a plea, and, because of Iowa's rules, they would then enter C.B.'s plea for him, without his consent.  C.B. also stated to Egly that his lawful name was not Christopher Bruce, but was Christopher, the living man, and that he was no longer a U.S. Citizen, and that she had no jurisdiction over him, in that way, either.  She would ignore this, and continued to state the hearing date the matter would be heard, concerning the charges brought.  As the hearing neared its end, the associate judge nudged Judge Egly, and reminded her that C.B. had challenged her jurisdiction over him.  She ignored her as well, and dismissed C.B..  She would not address the challenge until nearly three weeks later, in a hearing held in front of her, to determine Jurisdiction, and concerning that challenge.  Judge Egly would state that C.B.'s charges fell under a "State" Jurisdiction.  No proof of  Jurisdiction was offered C.B., merely

stated.  C.B. then stated that the matter was a conflict of interest; due to the fact that the State was hearing the case, the State was prosecuting the case, and the State was also a claiming to be a injured party in the case, and was seeking remedy in the place of the alleged "victim." and "The State of Iowa, as if representing damage of the whole state.  Judge Egly would then state "That's an interesting theory Mr. Bruce", claimed that all was proper, and that the matter would proceed as they had scheduled it.

66.    C.B. chose to represent himself pro se in all matters.  He would file a motion for a jury to hear the matter concerning the harassment of Darren Tromblay, within the allotted period of 10 days of his appearance, plenty of time for this to be filed.  After the filing, Linda Lane, the Assistant County attorney in charge of all of the cases following C.B.'s initial 2016 arrest, the harassment case; involving Darren Tromblay case; the felony case; and another case involving three simple misdemeanors charged against C.B. later that year; would then motion to combine he case numbers assigned to the felony case.  There was, filed by C.B., a motion for a jury trial for the misdemeanor case involving Tromblay.  C.B. specifically asked the clerk to file this in the lesser case for him, since C.B. hadn't received any documents concerning this case by this time, and didn't know the case number.  I know this request was read, because in the same sentence, I also asked that this motion be filed in ALL of his cases, to ensure that the request would be filed in the Tromblay case as well.  This motion, in the misdemeanor case, was lost in the shuffle of combining case numbers, and did not show in the Tromblay case at all, only in the cases where such a request would be moot.  On the hearing to hear the challenge of jurisdiction, Carol Egly did inform C.B. that there would be a non jury trial for the misdemeanor case that would be held on March 3rd, 2016.  C.B. did, then, mention that motions had been filed in ALL cases, asking for a jury trial. Judge Egly would state that it was now too late, and denied C.B. a jury trial, even though the motion had indeed been filed in sufficient time, but had been misplaced due to the combination of cases.  Later, C.B. would be given a copy of the court record by someone on the outside who he had given access to his efile, where it then stated that the claimant, in the misdemeanor case, had asked SPECIFICALLY for a NON-jury trial.  Also in place of C.B.'s motion, was a substituted motion, evidently designed by those of the clerk's office, that stated this as fact, also.  The motion on

the record of the court was neither designed or submitted by C.B., and this is most obvious, due to the fact that the other motions, filed by C.B. in these cases, looked nothing like it, per its layout and wording, showing that he had asked for a non-jury trial, when the others, filed in the other cases, had asked for a jury trial in contrast; something it was obvious he would get in the felony trial anyway. Thus, Polk County did change the record of the court and substituted his motion for their own, and showed it to state that it was his wish for a non-jury trial, in order to deny the claimant his right to a trial by jury. The reason for this fraud by the court will be shown next.

67.  On February 29th, 2016, a hearing was held concerning C.B.'s reservation of rights, his declaration of alien status (he is no longer a dead U.S. Citizen, he is a living breathing man, and he has rescinded all signatures with all agencies of Government, NUNC PRO TUNC), and C.B.'s right to represent himself, pro se, while incarcerated, without the need for an attorney. Judge Kelly, who oversaw this proceeding, would blatantly DENY C.B. that right in this hearing. They then ruled that, since there was nothing on the record of the court concerning any change of status, that it was evident that C.B. was still who they claimed him to be. Naturally, since he was never released until well after this time, nothing showing this WOULD or would be, until it was too late. Having NO OTHER OPTION, C.B. then accepted the appointment of attorney Lucas Taylor, as my stand-by attorney. Otherwise, materials he would have needed to defend himself, and evidence filed, would have never been given to me.

68.  On March 3rd, 2016, a "trial" for C.B. was held, and was overseen by Magistrate Anastasia Hurn of Polk County, Iowa. Just prior to the recorder being activated, Ms. Hurn was visited by Judge Price. Upon noting who was in front of her, he sneered at C.B., then turned and walked into chambers. Upon reaching chambers, he was heard to say "Get him...he's a piece of cake". Then, in the face of all logic, she would find me guilty of harassing Darren Tromblay and Jeffrey Pitts. C.B. had an email sent to him from Mr. Tromblay, signed by him, stating he would do a story. He then blatantly perjured himself, and testified that he decided, after looking into the matter, that there was nothing that Polk County had done to the claimants, those listed in this entire Claim until this point, and related to him almost word for

word, that constituted a story, and that he had only promised that he would "Look into doing it.",then decided that he wouldn't do one, and did not let C.B. know this in any way; but he was still found to be guilty of harassment.  If there had never been a story, then Darren and C.B. should have never even spoke of it to begin with. He had 2 years worth of documentation, and he couldn't have said there wasn't a story then? These charges were filed against me, because he HAD looked into the story...and someone, more than likely of the County Attorney's offices, had told him that he had best NOT do that story, but instead, conspired with him to have me arrested for harassment, should I press the issue.  C.B. also knew that this was done maliciously, because he had a written email from him, stating that if he pushed him at all, that he would file charges against him.  Mr. Pitts had never had even a single communication with C.B., yet both he and Darren (who by this time, had accepted, easily, over 50 emails from him, and had also asked that he "keep them coming") were afraid of C.B., because of these two emails; and blatantly perjured themselves on the stand to make this overly clear.  The emails that would have damned the case, sent to C.B. by Mr. Tromblay, stating his intent to file frivolous and untrue charges against him if he pushed to get the story done; along with other emails that would have helped, could not be filed, because of the denial of C.B.'s pro se rights while incarcerated, nor could they be retrieved, because of the distance of the court to his home (C.B. lived in Carroll, Iowa, 84 miles away, and had no car.  E.B. is technologically challenged.) No exhibits are found in any of C.B.'s misdemeanor cases, to be on the record of the court, though these are public proceedings.  Regardless of statute, it is unconstitutional to not maintain these exhibits on the record, and a violation of due process, in case of an action that would incur against them, say, in a civil Federal court.

69.   At the end of the "trial" C.B. then verbally filed an appeal to the case, then wrote it out officially and filed it, using the mail service in the jail.  Later, in C.B.'s post-conviction relief case, this appeal would be labeled his "appeal claiming unlawful arrest" (see PCCE080717 and FECR292312), but this is not listed by C.B. to be a reason for the appeal; either on the appeal notice itself, or anywhere else.  The appeal was decided by none other than Judge William A. Price.  He of course, held up the conviction by Magistrate Hurn, as expected; even going as far as disagreeing with Magistrate Hurn concerning the degree of my threats, as "veiled", stating

instead that they were most CERTAINLY real threats, meant to frighten Darren and Jeffrey. C.B. has absolutely no record of any violent crime to date, and, regardless of any threats made to anyone, real or "veiled", has never been accused of or convicted for a violent crime in his life, and has never followed through on even one threat to this date. The point of the matter is, a promise was made, a contract was SIGNED by Mr. Tromblay to do the story, and he hadn't done one, or even spoken with C.B. for 2 full months. C.B. then, had LEGITIMATE purpose with which to contact Mr. Tromblay, and it should have been found as so; but because it involved Judge Price, and his pet magistrate, Ms. Baker-Hurn, C.B. had been duly denied a jury of his peers by Judge Egly, and because C.B. had been denied the right to proceed pro se while incarcerated, C.B. was found guilty, and would have been found guilty, regardless, because of Judge Price and his obvious bias against C.B., and his influence and command of Magistrate Hurn, and also because of the same bias, would also be expected to uphold that decision as the non-appellant appellate judge. C.B., then, has shown, without a doubt, that a meeting of the minds occurred between the report filer (Darren Tromblay), the county attorney's office (Assistant Polk County attorney Linda Lane, now an Assistant U.S. Attorney, was someone who prosecuted and also presented as the party to the case in EVERY CRIMINAL CASE C.B. INCURRED, from this case until her promotion, three in all, from January until December of 2016, using quite a variety of simple and aggravated misdemeanors and felony charges, over eight in all in a one year period), Judge Price, Judge William Kelly, Judge Egly, Magistrate Hurn, to conspire against, withhold and deny the plaintiff each and every civil and due process right available, in just what I've stated so far.

70.   Mr. Lucas Taylor was assigned to C.B. on March 3, 2016 by Judge Kelly, while claiming he agreed to do so (though he had no other option, and was, in essence, forced to take Mr. Taylor on in order to get anything to help him in his pro se defense) as "stand-by council." An experienced attorney in felony cases, Mr. Taylor never once mentioned that maybe C.B. should ask for a bond reduction hearing (they did finally lower the bond - right after the jury found me guilty, and before official sentencing, giving me around a two week period of freedom before my sentence - to what it should have been, $4000 for the two aggravated misdemeanors. The felony charge was dropped against the claimant during trial); never once

suggested depositions, (probably the most important part of any felony case) and did not poll the jury at C.B.'s request, following their verdict to see if they had been tainted by a Des Moines Register article that likened C.B. to a "lawless, murderous domestic terrorist" that had appeared just one day before jury deliberations; to see if maybe a mistrial should be motioned for. Mr. Taylor would later testify, in the post-conviction relief case some months later, none of those things had fit into his "defense strategy". Mr. Taylor's "defense strategy" would also include not being able to attend a very important hearing where each and every subpoena of every official and employee of any branch of Government (they would be called as hostile witnesses for the side of the defense) were quashed, and nearly ALL of C.B.'s evidence, over 200+ exhibits filed in my case, would be dismissed as "irrelevant" In the post-conviction case that followed, C.B. would be accused of being the attorney in charge, and claimed that the "limit of reach of the stand-by attorney", filed by C.B., which essentially just ordered that Mr. Taylor not file anything into the case without asking his permission to do so; was found to be reason enough for Mr. Taylor to not speak until spoken to, nor do anything else that might be in his client's best interest; by Judge Vaudt. Finally, it was in Mr. Taylor's "defense strategy" to not file an appeal for C.B., while he was incarcerated during the ENTIRE period of his time to get it filed, after promising C.B. that he would. Mr. Taylor would later testify that he didn't remember if C.B. had asked him to file an appeal for him or not. It wasn't until the exact date of his release that C.B. found that Mr. Taylor had not filed it; and by that time, the time to file it had lapsed. Judge Jeanne Vaudt, in our post-conviction case, ruled that it had been MY responsibility to file that appeal, since I had once again taken the reigns as the lead attorney, and Mr. Taylor had been set back to stand-by status.

71. On March 16th, 2016, Judge Blink held a hearing to discuss subpoenas that C.B. had been asking to have served at state expense. At this hearing, Judge Blink would mention that C.B. had once again been questioning the court's jurisdiction over him. He then stated that, unless C.B. gave that court their jurisdiction, that Judge Blink would not be able to enforce the subpoenas be served. C.B. then granted him his jurisdiction, without question. What Judge Blink failed to mention was, that later, during a quash hearing, he would summarily dismiss nearly every witness C.B. had summoned.

72.   On April 8th, 2017, a hearing was held with Judge Blink, 3 days before trial
      (the Thursday before the Monday trial). Lucas Taylor was "unable to attend." The
      hearing was to hear opposition to the claimant's subpoenas, which had been
      served around the end of March, 2017, to discuss evidence filed by C.B.,and to
      discuss the prosecution's motion in limine.  This motion had been filed in the
      case on April 7th, 2016, just a day prior to the hearing.  Concerning item 4 of the
      motion, C.B., who had discarded his name, a legal fiction, used his unalienable right
      to simply change what he is called, is being ordered not to use or be addressed by
      this alternate name.  Ms. Lane was asking that C.B. not use that name, not
      because she didn't want to confuse the jury, as she claimed, but so that the reason
      for this choice of name wouldn't be disclosed.  It also states that C.B. had not filed
      anything, or provided any legal documentation showing that he is able to be
      identified as this person.  This had been due, primarily, to the fact that C.B. had
      been incarcerated since his arrest.  She goes on to state that the name they use is
      the name I'm being charged under, not the alternate name.  In item 5 of the motion,
      it requests that the claimant not mention or describe events or ask witnesses to give
      testimony concerning C.B.'s juvenile cases, in particular, JVJV237203.  She states
      that this testimony or evidence is not relevant to the matter at hand (the case
      itself), and also because "its probative value is substantially outweighed by the
      potential to cause prejudice, waste of time, confusion, or to mislead the jury." This is
      not being requested for these reasons, it is being requested because they want
      nothing that happened in those cases to come to the fore, since they had done such a
      good job hiding these events using confidentiality.  Judge Blink then dismissed
      nearly 190 or so pieces of evidence that had been filed by C.B. in his defense, nearly
      all of his evidence, showing that this case had been implemented against him; not
      because he had committed any real crime, but because those pitted against him
      needed to get him out of the picture, a defense that C.B. had planned to bring in this
      trial.  Then, the Judge addressed motions to quash subpoenas, and dismissed nearly
      28 witnesses, all who were elected officials and people in positions of civil duty.
      Then, to be sure of obliterating the defense of C.B., he then dismissed those that
      were not even present in the courtroom, nor were their attorneys present.  Later,
      Mr. Taylor would testify (in the post-conviction relief case), that he had informed
      the remainder of C.B.'s witnesses, all called to uphold the character of C.B., to
      not come in, that they would not be needed to testify; without informing the

claimant of this.  He also testified that their testimony wasn't needed, because it wasn't part of his "defense strategy." These actions by the afore-mentiond destroyed the defense of C.B., just three days before trial including two weekend days.and offered him no chance to recover his defense or plan a new one.

73.   On April 11th, the trial began, and would continue on for 3 days.  The first day, (while the prosecution was presenting their case) all of the remaining witnesses that C.B. had called showed up to testify (11 of the original 40 remained).  The next day, they all came again, but the prosecution had still not rested.  This would be the day that they were told by Mr. Taylor that they would not be needed, and need not return.  The following day was the presentation for the defense.  C.B.'s entire strategy had been destroyed, and he had no real witnesses or evidence left to present.  C.B., then, had no choice but to rest.  Also on the first day; a reporter that covered court cases for the Des Moines Register, Iowa's main newspaper; Mr. Grant Rogers, showed up to gather facts, and witness the first hours of the trial.  He stayed until around an hour of the prosecution's case, left, and did not return. Later, following the issuance of the resulting 2 page story, several quotes were given Mr. Rogers concerning C.B. and this case.  Those included ONLY County Attorney John P. Sarcone, the alleged "Victim", Ms. Jeanne Munson, and a member of the FBI.  No facts were checked, no "other side of the story" was gotten from either C.B. or his "stand-by attorney", and Mr. Rogers did not stick around to hear anything that had happened on the side of C.B.  This article was printed the next day, and easily left any reading it to believe that C.B. was damaged, mentally, and was a murderous, lawless domestic terrorist.  It was so damaging, the landlord of his trailer court in Carroll would then would ask C.B. to move out.  The day following his conviction, the claimant would ask Attorney Taylor to poll the jury, in order to get a feel for whether a mistrial might be needed.  He promised that he would, then did not.  He would also testify at the post-conviction relief case that this was something he didn't feel would work, in his experience, so he didn't follow through with the poll.  When it was mentioned to the judge that the jury might have been swayed by this article, Judge Blink would state, simply, that the jury had been admonished, at the beginning of trial, not to "pay attention to the media" concerning the case or C.B.. and that this was, obviously, all that had to happen to ensure that they did NOT pay attention to the media.

74.   On April 16th, 2016, C.B. was found "Guilty" to the two aggravated misdemeanors
of Stalking and Harassment in the first degree, using a jury tainted by the
Register's libelous article, and who would also be efficiently deprived of any and all
information they would need that would show the conspirator's actions against C.B.
that caused C.B. to even be before the jury; let alone what might have caused his
current situation; such as emails sent out to DCFS social workers in Los Angeles.
They certainly would not ever know these facts, thanks to the dismissal of all
witnesses and evidence that would have shown other reasons for C.B.'s desperate
words as spoken to Mrs. Munson and Mr. Worthington; as well as witnesses that
would have shown C.B.'s normal character and demeanor, such that it would have
easily shown that C.B. was never someone who would, under normal circumstances,
ever make threats like this unless he was backed into a corner with no way out of it.
Threats, a felony, was eventually dismissed by Judge Blink, due to the language
used in the statute, stating C.B. did threaten the use of an explosive or incendiary
"device." C.B. was innocent of violating this statute, because he did not do so.  Judge
Blink would praise Mr. Taylor for "getting the charge dismissed" at sentencing, but
C.B. knows and would state that the only reason it did get dropped is because the
jury didn't understand the language of the charge; and had been deadlocked on that
verdict alone for quite some time.  C.B. did NOT threaten the use of any kind of a
device, and all knew that.  Certain conspirators named in this action instructed the
Altoona Police Department to file a report for this charge, then approved this charge
within an hour's time, because they desperately needed a bigger and additional
charge in place in order to better deprive C.B. of his freedom before trial (through
the avenue of bond/bail), and knew the language used in the statute that allegedly
described this crime did not exactly describe what C.B. had done.  C.B. believes this
was the real cause of the jury's deadlock, not anything that Mr. Taylor had done,
which was little to nothing unless it proved detrimental to C.B.'s defense.  A deal
was offered C.B. that had dropped the charge, so C.B. already knew it wouldn't
stick.  Polk County often offered to 'deal' out those charges they thought they
couldn't win out on.  Polk County is also notorious for making as much stick to a
prisoner as they're able to, however they could get away with it too, should a
defendant opt to refuse those deals and go to trial.  The claimants believe strongly
that this behavior includes jury programming as well as tampering by use of the
avenue of the media for example, and more; and depriving those defendants of

everything they need to win, such as by dismissing important evidence as 'irrelevant' and witnesses of important caliber for the defense just prior to trial. Each witness would 'testify' in their affidavits and motions to quash, consistently, and almost using the exact same language in each motion, that none of them had knowledge of the defendant or concerning the facts of the case before them; and each and every one would claim to be victims of my wont to harass them (because of C.B calling them unnecessarily as witnesses) and would claim it was overly burdensome for each one of them to have to testify; even when C.B. might only need them for all of 5 minutes, or possibly...less.  C.B. claims that these witnesses knew full well of him, and all actions taken against him...mainly because C.B. engages in measures to ensure they don't forget what they've done. After the verdict came back, Judge Blink then lowered the defendant's bond to what it should have been at the very beginning, for only the remaining two charges, the two aggravated misdemeanors, to $4,000, and allowed the defendant to bail out for the two weeks prior to his sentencing, for $400.  The claimant opted to do so, and went home.

75.   Sentencing commenced May 4th, 2016.  Presented by the prosecution at this hearing were recordings of phone calls made by C.B. to his wife, and to others. During the course of C.B.'s incarceration, the phone company that had provided him the ability to make calls, began relating to him his rights, and stated that anything he said might be used against him in a court of law, as if these calls were, in essence, interrogations.  C.B., from this point forward, then had no private way to relate or discuss anything concerning his case.  Mail, both out and in, was read, and checked for possible contraband and incriminating statements.  Anything that was typed to anyone was thrown away.  The majority of phone calls made to C.B.'s wife, his "Stand-by attorney" and others were privilege, both marital and attorney-client, and could have also been construed as "work-product privilege", because of the claimant's status as "Pro Se Litigant."  When this objection to the phone calls was made to the Judge, he would state that I was given warnings of this with each call I made from jail, and was, essentially, choosing to speak regardless of those warnings (the only alternative to this, of course, was not speaking to anyone at all, ever) and anything said could be used against me...and was.  During the course of the sentencing hearing, the judge threatened my friend, Brent Swallers' who had written both the prosecution and the judge on my behalf, and had been

ridiculously polite in his communications with both; with charges of harassment of both the judge and the prosecutor, if he were to contact them further. His purpose had been to find an alternative to jailing C.B., and offered to pay his debt immediately to avoid the same. This threat was not included in the transcripts of this case.

76.   C.B. was sentenced to a year, suspended, with an incarceration of 60 days more days to be served for each of the two misdemeanors, to be run concurrent. He would then report for probation for a period of two years. At no time was C.B. told, by anyone, where to go after his release, or how to get signed up for probation. C.B., prior to his release, had to ask other inmates how to do all of this. The first violation of this probation, by the way, was to be 90 days, per Judge Blink, and would increase exponentially with each subsequent violation. It was then the notion that probation was exactly what they wanted for him, came to mind. Anytime they didn't care for what I was doing, they could violate me and put me in for longer...and longer. Also, as a condition to probation, Linda Lane had mentioned limiting me in my internet use, another perk for them. Later, when and if probation ever ended, they would have found a reason to find me to be in need of a probation extension.

77.   During the course of his incarceration, C.B. noticed that his release date did not match the date of release, stated by Judge Blink. C.B. immediately sent a letter to Judge Blink, asking for reconsideration of sentence, because the release date was for nearly 2 months later than his release date, almost double his incarceration time.

78.   On June 1st, 2016, a hearing was held for the reconsideration of the claimant's sentence. The release date was corrected by Judge Blink (Oops! They must have gone consecutive instead of concurrent. My bad!) Presented by C.B. at this hearing were 4 full sheets of harassing comments made on C.B.'s online blog and on Facebook, some were out and out marked with the name of the State's 2nd primary witness, Mark Worthington; others, more threatening, were done using a fake profile with another name. The state had, during sentencing, asked for an order of protection to be issued concerning this witness, but, since C.B. had presented this

evidence, and the judge would have had to order the witness be arrested for the
same crimes being alleged against the defendant, and therefore, to protect him,
would not order protection for Mark Worthington; since that order would have to be
enforced both ways, a question C.B. specifically asked the judge just prior to
presenting the evidence of Mark's harassment of him.  That harassment by Mark,
by the way, continues to this very day.

79.    After C.B.'s release, he went, the following morning, to the Polk County courthouse
to sign up for his probation.  Upon entering the courthouse, and going to the proper
room, C.B. was immediately asked for $300 to sign up for this, and told that if he
didn't have it then, he was to pay it soon.  He then spoke to someone about signing
up, and during the course of this, decided against doing probation (they had
wanted him to sign away his right concerning illegal searches and seizures).  C.B.
was also told that they didn't have probation where he lived, and would have to go
to Ames,  nearly 60 miles from where he lived (C.B. had no vehicle.)  He told him
that he would speak to the judge about this, and did not complete his application.
C.B. then immediately submitted a letter to Judge Blink on July 11th, 2016, asking
for another reconsideration date, where I would ask to be revoked from probation
and do the remainder of my sentence.  In the letter, C.B. also asked Judge Blink for
a little time to make sure all of his affairs were in order, and that we were moving
back to Des Moines, Iowa, because he wanted his wife to be closer than 84 miles
away for visits (and, because we had been asked to move out of our home in Carroll,
Iowa).  Judge Blink then set the hearing date to hear this motion for August 18th,
2016, almost a month and a half later.  Meanwhile, just after the claimants moved
to Des Moines, a letter was mailed to C.B. to his now former home in Carroll, Iowa,
allegedly, from the Ames probation office, setting an appointment for him to meet
with his probation officer; which of course, C.B. would never recieve.

80.    On July 24th, 2016, a document was filed in the case, from the Ames Probation
office (the same that had sent C.B. the appointment letter), stating to the Judge
that C.B. had not shown up for the appointment they had set up for him; asking
Judge Blink to violate me, and issue a warrant for my arrest for probation violation.
As C.B. also received notifications in his case in email, he noticed this, and
immediately wrote another letter to the judge, stating that there was already a

hearing date set to hear the matter of my voluntary revocation, in place; and to please not issue a warrant for his arrest. On July 25th, 2016, Judge Blink issued the warrant anyway. C.B. never received a notification of this warrant being issued.

81. Also on July 25th, just after seeing this warrant issued, and knowing that it was wrong of Judge Blink not to disprove of it; Mr. Taylor asked to withdraw from the case. The next day, on July 26th, 2016, Judge Blink would deny that withdrawal.

82. On August 16th, just two days before the reconsideration hearing, C.B. would be arrested again by the Des Moines Police Department, after being set up to get arrested by an apartment complex that wanted him officially removed from where he was LEGALLY and LAWFULLY placed, in front of their property, on the charges of three simple misdemeanors: for harassment of an officer, disorderly conduct/making a loud or raucous noise in the vicinity of an abode or apartment complex, and for calling 911 without an emergency. Bail would be set by Judge Price (the judge on duty at the jail at the time) as $500 per charge, cash only bond, for a total of $1500 cash, also stated to be required because of my "extensive criminal history." Judge Price also claimed that the hearing to decide my revocation, two days later, was now moot, because I was already in custody. NOTE: C.B. has opted not to embarrass the Des Moines Police Department and Officer Kyle Thies in this Claim, concerning the reasons or the manner of the arrest in this case.

83. Linda Lane was once again in charge for the prosecution of the case. All charges were offered to be dropped IMMEDIATELY, but C.B. felt that the matter should be presented to a jury, because he felt that the arrest and the charges that resulted were ridiculous and unlawful, and asked for a jury trial. This trial was held on September 16, 2016, in front of Judge Hanson, and the defendant was found to be guilty of two charges by a jury; and a third, for harassment of a peace officer, was dropped. the sentence was already in effect, and was made to run concurrent with that sentence.

84. During the time that C.B. served the remainder of his sentence; he would file,

with Polk County, an application for post-conviction relief, and it was filed on
October 17th, 2016, while C.B. was still incarcerated.

85.    Linda Lane would appear in the case for post-conviction relief on October 25th,
       2016.

86.    On February 10th, Attorney Lane emailed C.B., stating she wanted the claimant to
       call her right away.  C.B. did, and was told that Ms. Lane no longer worked for the
       Polk County Attorney's offices.

87.    After his release, and just two weeks before the trial concerning the post-conviction
       relief case, C.B. wrote an email to the Polk County Attorney, asking that it be
       forwarded to John P. Sarcone himself.  In it, C.B. taunted him, and told him
       that the trial concerning his post-conviction relief case was in two weeks, and that
       he would lose the case if he didn't step on it.

88.    On the same day, within the same hour of him receiving this email, an appearance
       was filed in the post-conviction relief case, stating Mr. Jesse Ramirez would be
       handling the case for the state.  Judge Jeanne Vaudt would be hearing the case.
       Filed the same day as the letter was sent to the County Attorney; and filed directly
       after his appearance, would be a motion asking that the court order C.B. to
       recast his application for post conviction relief, because, allegedly, the County
       Attorney's offices did not understand the claimant's initial application, and, of
       course, wanted to be able to answer it, so he asked for a continuance. According to
       Iowa's rule of civil procedure, the defense (as named by the claimants) had 60 days
       with which to answer the initial application, filed on October 16th, 2016. Mr.
       Ramirez appeared 6 months later, 2 weeks before a trial was set.  Though C.B.
       would be dismissed his grievance trying to pull something like this in reverse, due
       to court time constraints; the court would grant Mr. Ramirez his continuance, and,
       knowing it would be ordered, C.B. recast the application; even though he knew the
       claims were clear enough, and that Mr. Ramirez was simply stalling for time.
       Attorney Ramirez answered the recast Claim, denying every one of  the allegations.
       C.B. claimed that they had ordered an unconstitutionally high bail, had denied him
       his right to represent himself pro se, and that his stand-by attorney had failed in

his duties in his co-representation.  Ms. Lane, the prosecutor that handled the case in question, and who had originally appeared in the case, had been promoted to Assistant U.S. Attorney's office, just prior to her email to C.B.; in St. Louis, MO. She, of course, would have been the plaintiff's best witness in C.B.'s case.

89.    On March 2nd, 2017, Judge Vaudt would deny three of C.B.'s motions; one requesting videotaping of the proceedings, one asking that subpoenas be served to his witnesses at state expense, and one asking for summary disposition.  Summary disposition had been asked for because no one had answered his application (within the time allotted a party to the case to do so), and no one besides C.B. had filed any motions into the case.  None of these motions, Judge Vaudt would claim, were based in fact or law.  Finally, ruled to be indigent and the court ruled that the filing fee should be waived because of that, but would later deny him state expense to get his subpoenas served.

90.    C.B. had to borrow money to have a friend serve subpoenas for him.  Out of the eight witnesses for the claimant, only one was able to be served, the one for the Polk County Attorney, John P. Sarcone.  The rest of his witnesses were impossible to reach by any means.  As mentioned earlier, Ms. Lane had been promoted, and could not be found at that time.  The judges were either not present, or in hearings; and their assistants, of course, were present accordingly.  If the Judges were gone, so were they.  If they were in court, so were they.  Grant Rogers, the reporter, was a part timer, and no one would divulge where he lived.  Randy Osborn, the Polk County clerk of court, had, by this time, retired, and like every other person on the list as a defendant in this action, has no address listed.  As for the one to the county attorney's offices, the woman who accepted service attempted to toss the subpoena back at the server, claiming it wasn't a legal serve, even though it most certainly was.  She told the server that, in order to serve John P. Sarcone, she would have to go to the Treasurer's office on 111 Court Avenue; somewhere that Mr. Sarcone didn't do any business, normally.  Naturally, just like in the felony case, C.B.'s only served witness would motion to have his subpoena quashed; and, similar to that case also, that motion would be granted.  The only witness to testify here would be for the State, and that was Lucas Taylor, CB's attorney.  Attorneys aren't allowed to be first person witnesses, by law, regardless of the proceedings.

91.   On July 1st, 2017, the State would file a brief. C.B. then simply answered the brief to the best of his ability. Several facts of the case in question were blatantly wrong, and C.B. would point these out in his answer. The judge, up until the day of the order some three months later, did not ever correct these "facts." These errors included the actual total amount of bail set on C.B.; that Mr. Taylor had withdrawn from the case on July 25th, 2016; when in fact, Judge Blink denied his withdrawal on the record the following day, that Lucas Taylor adequately represented his client in all matters, and more.

92.   On September 3rd, 2017, the C.B. received an email from Judge Vaudt, stating that both he and Mr. Ramirez had been sent an email by her, prior to this, that had asked us both to file a proposed order for her ruling, and had asked that it be filed no later than September 1st. By this time, C.B. had received numerous emails from both the judge and Mr. Ramirez with no issues, so this was obviously a trick depriving C.B. of any real time to put together a "proposed order," something this claimant has never heard of being required of litigants or defendants in a civil matter. The State turned theirs in the next day, though Mr. Ramirez adamantly claimed that he never got notice of this either in his email. Strangely enough, the State's brief, almost word for word, would morph into their 'proposed order," and was filed the next day, with nearly no changes made. Then, even stranger still, the State's brief turned proposed order would then morph into the final order, also with no changes made; and, even though I pointed out the obvious errors to the court in my answer to the brief, they remained as they were on the order too, in error. That order was filed in Mid-October, 2017, over three months after the trial. Obviously, there was no real reason for the hurry to get our "proposed orders" nearly a month before this, so that Judge Vaudt could, essentially, just sign her name to the one submitted by the state and call the matter settled and over with. C.B. believes to be a fact, and this is shown best in the unchanged order, that Judge Vaudt was simply going through the motions in order to get this case over with; and had absolutely no intention to redress any of the claims made by C.B.; and it's glaringly obvious that none of the maintained evidence, filed by C.B. was ever reviewed by her either, since none of it is mentioned in any portion of these proceedings.

93.   On October 7th, 92 days after the trial, the order was filed, denying C.B relief on EVERY matter concerning his request for post-conviction relief.

94.   The claimant had initially planned to appeal this decision, but, remembering the"justice" he received in his juvenile case appeal to the appellate courts, and after going through THIS case with no better results, decided it was best that he quit wasting his time seeking true justice that would never be his in the crooked courts of Polk County; and chose instead to file this claim in federal court.

## RELIEF

The claimants request the court to grant them relief, using these considerations:

1.   That this court order that E.B.'s rights to parent be restored to her without fail, concerning T.B, her rightful biological property.  The claimant would ask to have the child returned to her possession; and if this is somehow not possible, she would at least like an opportunity to have visitation with her daughter; who was, essentially and by all legal definition, after it was decided by both the agency that removed her and their director; that the child was removed from her in error, and kid-napped by Ms. Nieman from the hospital.  The claimants ask that charges be filed against Ms. Nieman for all the wrong she did the mother, and for libel and slander of both the claimants.

2.   That an award of punitive damages be given the family for nearly four years worth of mental anguish, malicious prosecution, libel, slander, false imprisonment, and finally, for the total and vindictive defamation of both our characters; and that this amount be taken from all those involved, including all the defendants named in this claim, and their agents.

3.   The claimant Christopher wishes the court to order that his record be expunged of all charges over the period of the last 3 years, including any record of arrests, charges or convictions.  In a background check done on the claimant, recently, it was relayed or shown by those of Polk County that the claimant had convictions of two felonies on his record.  The claimant has never once been convicted of a felony.

4.   The claimants pray this court find the Carroll Police Department to be in default, and order them to grant the amount they willingly contracted and agreed to; concerning their unlawful entry. without invitation, into our home on January 24th, 2016.

4.     That injunctive relief be given the claimant Christopher, to keep John P. Sarcone and his offices from terrorizing the claimant, by calling the offices of the FBI all over the country in an attempt to have him investigated and arrested.

5.     Lastly, the claimants would hope that the court would see the obvious crimes of the County attorney and his offices. and see his hand through the actions of his assistants in all the afore-mentioned cases - Stephanie Brown, Kevin J. Brownell; Kevin Bell, and Linda Lane; and would not only insist that he resign his position as Polk County Attorney, but that charges be filed against him for what he has done and continues to do in damaging these claimants.

In conclusion, the claimants, who, unlike those who charged against the claimant Christopher in all criminal matters and both in all juvenile matters; did in fact, come forth and swear to be the injured parties in this claim; both living breathing state nationals of the republic; pray the court not be lenient on those of Polk County for their collective criminal and lawless actions against our family.  An example must be made of those who feel that they can abuse their power and positions to do whatever they want, whenever they want, to whomever they wish; regardless of their oaths, their bonds, 'The Law', and their promise to Iowa that they would support and uphold the rights of the Constitution, concerning their living citizens.

The claimants also seek the court to provide for this matter to be heard by an impartial jury of our peers, as is our right.

Christopher (Bruce), the living man                    Date: 2/9/2018
Sui Juris, All rights reserved
701 S. Duluth Avenue, Apt. 1
Sioux Falls, SD  57104
515-868-9401
cbstraighteight@gmail.com

Elizabeth (Bruce), the living woman               Date: 2-9-2018
Sui Juris, All rights reserved

**CERTIFICATE OF SERVICE:** The claimant states that this claim shall be issued to all the defendants in the manner of certified mail, in the time this court allots it to be served after it is filed in your offices; after my mailing it to the clerk of court on this day, February 2nd, 2018. Linda Lane will not be served, since she cannot be found, and the DOJ refuses to answer me as to where she works as an Assistant U.S. Attorney.



FROM:

Christopher Bruce
701 South 4th Ave #1
Sioux Falls SD
57104

TO:



**UNITED STATES POSTAL SERVICE.**

*Retail*

**P**

US POSTAGE PAID

**$7.70**

Origin: 57104
Destination: 50309
1 Lb 12.70 Oz
Feb 09, 18
4678610101-10

1004

**PRIORITY MAIL 2-Day ®**

Expected Delivery Day: 02/12/2018   C082

USPS TRACKING NUMBER



9505 5135 2847 8040 1014 97

of Court

S District Court

E. Walnut St.

Moines, IA 50309